# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | |
|---|---|
| **ANNA F. KLINGER,** )<br>)<br>    **Plaintiff,** )<br>)<br>**v.** )<br>)<br>**COMMISSIONER OF SOCIAL** )<br>**SECURITY,** *sued as Nancy A. Berryhill,*[1] )<br>)<br>    **Defendant.** ) | **CAUSE NO. 1:16-cv-00166-SLC** |

## OPINION AND ORDER

Plaintiff Anna F. Klinger appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for disability insurance benefits ("DIB").[2] (DE 1). For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Klinger applied for DIB in August 2011, alleging disability as of September 15, 2010. (DE 9 Administrative Record ("AR") 380-86). Klinger was last insured for DIB on June 30, 2012 (AR 502), and thus, she must establish that she was disabled as of that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that with respect to a DIB claim, a claimant must establish that she was disabled as of her date last insured in order to recover DIB).

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, 853 F.3d 322 (7th Cir. Jan. 30, 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (DE 12); *see* 28 U.S.C. § 636(c).

The Commissioner denied Klinger's application initially and upon reconsideration. (AR 211-17). After a timely request, a hearing was held on December 3, 2012, before Administrative Law Judge Maryann Bright ("the ALJ"), at which Klinger, who was represented by counsel; her ex-husband; and a vocational expert, Marie Kieffer (the "VE"), testified. (AR 94-141). On January 14, 2013, the ALJ rendered an unfavorable decision to Klinger, concluding that she was not disabled because she could perform a significant number of unskilled, sedentary jobs in the economy despite the limitations caused by her impairments. (AR 159-69). However, upon Klinger's timely request, the Appeals Council granted review and remanded the case for another hearing. (AR 177-80). The second hearing was held on September 24, 2014, and the same individuals testified before the same ALJ. (AR 49-93). On November 12, 2014, the ALJ issued another unfavorable decision (AR 27-38), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

Klinger filed a complaint with this Court on May 19, 2016, seeking relief from the Commissioner's decision. (DE 1). Klinger's sole argument on appeal is that the ALJ failed to properly evaluate the opinion of her treating specialist, Dr. Thomas Keucher. (DE 17 at 7-8).

## II. FACTUAL BACKGROUND[3]

At the time of the ALJ's decision, Klinger was 43 years old (AR 38, 142); had obtained her GED (AR 477); and possessed past relevant work experience as a housekeeper, rubber goods cutter, and salesperson (AR 36, 525). Klinger alleges disability due to lumbar degenerative disc disease/back strain. (DE 17 at 2).

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 1,226-page administrative record necessary to the decision.

*A. Klinger's Testimony at the Hearing*

At the hearing, Klinger, who was five feet, three inches tall and weighed 130 pounds, testified that she lives with her ex-husband, who is on disability due to a stroke; she has four adult daughters. (AR 55-56). She testified that her ex-husband "takes care of [her]" in that he does all the laundry and the cleaning, and he helps her get dressed if she needs assistance. (AR 56, 71-72). She was on food stamps and did not have health insurance; she had been on Medicaid, but it was denied the previous month. (AR 56-57, 72). She drives a short distance each day to visit her daughter, who has two small children, and stays about an hour. (AR 58). She had driven herself and her ex-husband to the hearing. (AR 59). She smokes 20 cigarettes a day. (AR 66-67). She stopped working in September 2010 because she injured her back in her housekeeping job. (AR 60, 62). Most days, Klinger watches television, alternating between sitting in a recliner and lying down, and prepares dinner; she grocery shops with her ex-husband. (AR 67-68). Her hobbies include reading and crocheting; she can read for an hour at a time, but sometimes has to reread the material. (AR 68).

When asked why she thought she could not work, Klinger stated that she is in constant pain; that the pain medication she takes makes her tired and unable to concentrate; and that she has to lie down for an hour, three or four times a day. (AR 65, 69-70). She stated that her back "starts to hurt pretty good" after standing for three minutes, and that she can stand for 10 minutes at most. (AR 65, 68-69). The pain extends into her hips and down her legs. (AR 67). She sits on her hands, using them to take pressure off of her back. (AR 69). If she bends over, her pain intensifies and she "get[s] stuck" and "can't move"; her ex-husband then has to help her move again. (AR 70-71). She can lift a gallon of milk, which weighs about seven pounds, but not

repeatedly; she agreed with the five-pound lifting limitation assigned by Dr. Keucher. (AR 71). She had undergone physical therapy and spinal injections, but they were not effective; she uses a heating pad, which is helpful.[4] (AR 66, 69).

In her decision, the ALJ concluded that Klinger's symptom testimony (and the testimony of her husband) were "not fully credible." (AR 31). Klinger does not challenge the ALJ's credibility determination concerning her symptom testimony.

## C. *Summary of the Relevant Medical Evidence*

On July 20, 2010, Klinger saw Dr. Kevin Rahn at Fort Wayne Orthopaedics, L.L.C., for complaints of low back pain after a work injury. (AR 741-42). Klinger told Dr. Rahn that she had injured her back at work two months earlier, in May 2010, and that the injury was a continuation of a prior injury "back last spring." (AR 741). She reported numbness in her left leg and a "fairly significant" constant ache and some tingling in her low back; she described her back pain as "stabbing" and "burning." (AR 741). On a scale of one to 10, she rated her pain as a "seven," but stated that it increases to a "10" at times. (AR 741). A neurological exam revealed no deficits; she had normal range of motion, except that forward bending was reduced by 50% due to paraspinal muscle spasms. (AR 741). Dr. Rahn reviewed a March 2009 MRI scan showing an annular tear at L4-L5, degeneration at L4-L5 and L5-S1, and dehydration at L4-

---

[4] Klinger's ex-husband also testified at the hearing. (AR 73-76). He stated that he has to help Klinger get out of bed and into a chair. (AR 75). He does all of the housework and laundry. (AR 75). He stated that Klinger easily forgets things, which he attributed to her medications. (AR 74). Klinger only prepares cold sandwiches for meals, as he does not allow her to use the stove because he is afraid she will burn herself or someone else. (AR 74). He will only let her drive short distances. (AR 75). When they go grocery shopping, she picks out the items but he does all of the loading and unloading; at times, she opts to stay home because the standing is too difficult for her. (AR 76). She had gone to the emergency room six months earlier for withdrawal when she could not obtain her medications. (AR 74).

L5 and L5-S1. (AR 742). Dr. Rahn diagnosed Klinger with low back pain; left leg pain; history of annular tear, L4-L5; and degenerative disc disease, L4-L5 and L5-S1. (AR 742). He prescribed a Medrol Dosepak, Mobic, Skelaxin for spasm, Vicodin for pain, and 10 sessions of physical therapy. (AR 742). Dr. Rahn released Klinger to return to work without restrictions, noting that "[t]hey seem to be working with her on her own" but that if work did become an issue, he would "get some official restrictions going forward." (AR 742; *see* AR 743).

On August 3, 2010, Klinger reported to Dr. Rahn that she was not much better when taking the medications he had prescribed. (AR 739). He recommended that she continue her medications, undergo an MRI, and hold off on further physical therapy until after the MRI. (AR 739).

Later that month, on August 17, 2010, Klinger told Dr. Rahn that she was having problems with pain. (AR 736). He observed that her recent MRI results looked about the same as her 2009 MRI results. (AR 736; *see* AR 747). Dr. Rahn recommended that she undergo an L5 nerve root block on the left to treat some of her increasing pain in the L5 distribution and her annular tear, which he thought was probably the main cause of her pain. (AR 736). He refilled her Vicodin and assigned a 25-pound lifting restriction and no bending or twisting. (AR 736). Dr. Thomas Lazoff administered the nerve block to Klinger on September 3, 2010. (AR 744-46). On September 14, 2010, Klinger visited Dr. Rahn, reporting that she was better due to the nerve block. (AR 732). She had very few leg symptoms and was almost off of Vicodin, stating that she had been taking "quite a bit of Vicodin" before the block. (AR 732). She mostly reported back pain. (AR 732). He recommended that she resume physical therapy; continue taking Mobic daily and Vicodin as needed; and to try Ultram, a non-narcotic medication, for

more consistent pain relief.  (AR 732).  Dr. Rahn continued her prior restrictions.  (AR 732-33).

Klinger saw Dr. Rahn again on September 28, 2010, reporting that she had a setback last week and was now at the point where she had to leave work.  (AR 727).  Her radicular symptoms in her buttocks and legs were much worse, especially with extension; the symptoms improved with sitting forward in flexion and decompressing the neural foramen.  (AR 727).  Dr. Rahn refilled her Vicodin and referred her for a discogram for a more thorough evaluation of her back problem to assess surgical options.  (AR 727).  He put Klinger off work until he could assess the discogram results, noting that she was better when off work.  (AR 727, 729).

In October 2010, worker's compensation denied Klinger's claim, and she was discharged from Fort Wayne Orthopaedics.  (AR 725).  Also in October 2010, Klinger was discharged from physical therapy at her request, having attended two visits since September 20, 2010.  (AR 748; *see* AR 749-60).

On October 22, 2010, Klinger presented to the emergency room due to increasing back pain, stating that her worker's compensation was refusing to pay for her treatment.  (AR 753). She reported severe back pain which was radiating to her legs, as well as some paresthesia or dysesthesia sensation in both legs.  (AR 753).  A straight leg lift was positive on the left for lower back pain and some questionable radicular pain, and was negative on the right until 70 degrees, when she had low back pain.  (AR 753).  She was given Norflex and Demerol, and her pain decreased to a "three" shortly thereafter.  (AR 753-54).

On February 9, 2011, Klinger underwent an internal medicine evaluation by Dr. B.T. Onamusi.  (AR 802-04).  She reported constant severe pain in her low back, which was aggravated by standing, walking, lifting, bending, or twisting; she also reported radicular pain

with paresthesia down her left leg.  (AR 802).  She denied any leg weakness, sphincteric

dysfunction, or balance problems.  (AR 802).  She estimated that she could sit for two hours,

stand for five minutes, walk one and one-half blocks, and lift 10 pounds.  (AR 802).  She could

perform housework, laundry, grocery shopping, self care, and drive a car.  (AR 802).  On exam,

her muscle tone, strength, reflexes, and sensation were intact, and she walked with a normal gait.

(AR 803).  She had no difficulty transferring on and off the exam table, and she was able to

squat, kneel, walk in tandem, and stand on her heels and toes.  (AR 803).  She had no problems

with grasping, reaching, or manipulation.  (AR 803).  She had some limitations in range of

motion of her back, with moderate discomfort during active motion and moderate to severe

tenderness around the lumbosacral joint; she had no paraspinal muscle spasm.  (AR 803).  A

straight-leg raise test was negative bilaterally.  (AR 803).  Dr. Onamusi opined that Klinger was

"capable of engaging in sedentary to light physical demand level activities as defined in the

Dictionary of Occupational Titles."  (AR 803).

On February 24, 2011, Dr. J. Sands, a state agency physician, reviewed Klinger's record

and completed a physical residual functional capacity ("RFC") assessment.  (AR 806-13).  Dr.

Sands concluded that Klinger could lift 10 pounds frequently and 20 pounds occasionally; stand

or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; occasionally

balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes,

or scaffolds; and must avoid concentrated exposure to hazards such as machinery and heights.

(AR 807-10).  Dr. M. Ruiz, another state agency physician, affirmed Dr. Sands's opinion the

following month.  (AR 814).

On May 12, 2011, Klinger visited the emergency room for a one-day history of

intermittent muscle spasms in her arms and legs. (AR 916). She had run out of Vicodin. (AR 916). She demonstrated normal muscle strength and gait. (AR 917). The doctor gave her an injection, instructed her to use heat or ice as tolerated, and encouraged her to see her family doctor in the next few days. (AR 917).

On September 1, 2011, Klinger visited the emergency room, complaining of a rapid heartbeat and shortness of breath. (AR 893-915). A musculoskeletal exam was normal, with non-tender, full range of motion. (AR 897). Her symptoms resolved, and she checked out against medical advice, stating that she would return if her symptoms worsened. (AR 909).

On October 4, 2011, Klinger was examined by Dr. Venkata Kancherla at the request of the state agency. (AR 865-67). She told Dr. Kancherla that she could not lift or sit for long and that she could not stand without pain. (AR 865). Dr. Kancherla observed that Klinger was able to get on and off the examination table without assistance, and that she could recline flat, sit up, squat, and walk on her heels and toes. (AR 866). She had normal strength and muscle tone, a normal gait, and her station was erect. (AR 866). She had a positive straight leg raise test at 60 degrees bilaterally and some decreased range of motion of the lumbar spine. (AR 867).

On October 28, 2011, Klinger went to the emergency due to back pain. (AR 871-92). She had run out of Vicodin the previous evening. (AR 881). Klinger was positive for muscle spasms, painful range of motion, radiating pain, and straight leg raises; she was negative for spinal tenderness. (AR 875). She was given an injection and a prescription for Vicodin. (AR 892).

On November 1, 2011, Dr. Richard Wenzler, a state agency physician, reviewed Klinger's record and completed a physical RFC assessment. (AR 930-37). Dr. Wenzler

concluded that Klinger could lift 10 pounds frequently and 20 pounds occasionally; stand or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to vibration.  (AR 931-34).  Dr. Wenzler's opinion was affirmed by Dr. M. Brill, another state agency physician, in February 2012.  (AR 977).

On March 1, 2012, Klinger was examined by Dr. Thomas Keucher, a neurosurgeon, at the request of worker's compensation.  (AR 650-51).  On examination, Klinger rose carefully from a chair and moved with a very small step size.  (AR 650).  She was able to walk on heels and toes with help for balance.  (AR 650).  Range of motion of her back was almost nonexistent in all directions, and her paravertebral muscles were tight.  (AR 650).  Her skin was marked with changes from the chronic overuse of heat.  (AR 650).  Straight leg raising was negative on the right, and on the left, it produced only back pain.  (AR 650).  Strength, sensation, and reflexes were intact in her low extremities.  (AR 650).  Dr. Keucher reviewed Klinger's MRI scans, stating that they showed some "very mild degenerative changes."  (AR 650).  He observed that though a circle had been drawn around one of the L5 neuroforamina, "this is not narrow, and the nerve is not being compressed."  (AR 650).  Dr. Keucher summarized:

> Mrs. Klinger has her symptoms on the basis of significant muscle spasm and limitation of motion.  In my opinion, she is not suffering from "discogenic" pain, and any treatment directed that way has a minimal chance of helping her.  I think the only possibility for her to improve is to start to regain her motion, and I have given her detailed instructions on how to do this with home exercise (physical therapy will not work and in my opinion would be detrimental).  I have given her a prescription for Norflex which may help, but it will be the exercise that starts to produce results.  I

have kept her off work and will see her back in a month.  My plan
would be to see if she makes progress, and if she does, I will
continue to follow her through her improvement.  If she
demonstrates that she either cannot or does not do the exercises
and is not making progress, then I would rate her.  I do not believe
she needs any other treatment, including injections and especially
including surgery.  Eventually, if she is able to improve, I would
plan to wean her from her narcotics, but this would be
inappropriate now.

(AR 651).

Dr. Keucher saw Klinger again on March 7, 2012, reporting that her back had "popped"

and that she was needing a walker to get around.  (AR 641).  She also reported numbness up to

her waist, but no bowel or bladder difficulties.  (AR 641).  Dr. Keucher stated that she was

"obviously quite stiff," but also "obviously not paralyzed."  (AR 641).  She had normal

dorsiflexion and reflexes.  (AR 641).  He told her that she probably had been trying to do

exercises without stretching and that the muscles were now tighter.  (AR 641).  He reviewed the

proper manner in which the exercises should be done and encouraged her to continue the

exercises.  (AR 641).

On April 3, 2012, Dr. Keucher wrote that Klinger was "doing slightly better."  (AR 642).

She was walking without a walker, though she still had a lot of pain.  (AR 642).  Although her

range of motion had improved, it was still greatly restricted.  (AR 642).  He kept her off work,

advising her to expect that her progress would be slow.  (AR 642).  On May 7, 2012, Klinger

was "doing significantly better."  (AR 643).  She could flex to touch nearly halfway below her

knees with much less pulling, and she rose with only a slight hesitation.  (AR 643).  Lateral

bending was also improved.  (AR 643).  He encouraged her to keep up her stretching exercises

and indicated that he would start her on a graded walking program.  (AR 643).  He reduced her

Vicodin to a maximum of two per day, and kept her off work for another month. (AR 643).

On June 7, 2012, Dr. Keucher wrote that Klinger "continues to make slow progress." (AR 644). He observed that although she said she was stiff, she rose easily from a chair. (AR 644). She had nearly complete lateral bending and could flex to touch halfway below her knees, though she noted some pulling in her back when doing so. (AR 644). He indicated that now that she was more flexible, he needed to shift her focus to building endurance. (AR 644). She was walking about twice a day, but only for about four minutes at a time; he told her to increase that to four times a day and to increase the length of her walks. (AR 644). He wrote her a prescription for Vicodin, but told her he would not write her any more and that he wanted her to wean from it. (AR 644). He kept her off work for the next three weeks. (AR 644).

On June 25, 2012, Dr. Keucher wrote that Klinger was making progress, walking at least five minutes up to eight times a day. (AR 645). Her range of motion was normal, although she still felt some pulling. (AR 645). He encouraged her to increase the length of her walks to build her endurance and conveyed "the need to push things"; he hoped that she could walk 10 to 12 minutes, four times a day, at a reasonable walking speed, which equated to about two miles. (AR 645). He stated that if she could do that, she would likely be ready for a work hardening program. (AR 645). He kept her off work until her next visit. (AR 645).

On July 16, 2012, Klinger told Dr. Keucher that she was walking about 10 minutes, four times a day, and that overall she was doing better. (AR 646). She had good mobility, flexing to touch within a few inches from the floor. (AR 646). He indicated that she was ready for a one-month program of work hardening, with a functional capacity evaluation ("FCE") at the end. (AR 646). He kept her off work. (AR 646).

On August 3, 2012, Klinger was evaluated by a physical therapist for purposes of starting a work hardening program.  (AR 647-49).  Klinger told the therapist that every movement increases her low back pain and that her pain was a "10" at times.  (AR 647).  She demonstrated limited range of motion in her back, and straight leg raise and slump tests were positive.  (AR 647-48).  She had intermittent numbness in her left leg.  (AR 648).  The therapist recommended that Klinger attend physical therapy four times a week.  (AR 649).

On August 20, 2012, Klinger told Dr. Keucher that she had not been going to many of her work hardening sessions, having attended just four in three weeks.  (AR 654).  She said that her pain had increased to where she could not tolerate the sessions.  (AR 654).  She could not touch her knees in forward flexion, but a straight leg raise test was negative.  (AR 654).  Dr. Keucher concluded that there was little to be gained by trying to continue with the work hardening.  (AR 654).  He encouraged her to continue her home stretching exercises.  (AR 654).  He assessed that she was at maximum improvement and quiescent for purposes of rating, and he assigned her a permanent and partial impairment of three percent of the whole person.  (AR 654).  He released her to return to work as of August 21, 2012, with permanent restrictions of "sitting or standing as needed, no bending, no working at heights or overhead and no lifting more than five pounds."  (AR 654; *see also* AR 1027).  He declined to write her any further prescriptions for narcotics, suggesting that she try using Norflex instead.  (AR 654).

About 18 months later, in March 2014, Klinger returned to Dr. Keucher because worker's compensation had some question about her capabilities and wanted her to be re-evaluated by Dr. Keucher and to undergo a FCE.  (AR 1077).  Klinger reported that she had been seeing a pain management doctor, Dr. Hedrick, and that she had received several injections.  (AR 1077).  She

had been using a cane for the past few days after "reach[ing] for something" a few days earlier. (AR 1077). She was taking 80 mg of Oxycontin a day and four Norco 10 mg tablets, as well as Neurontin, Naproxen, Enalapril, and Omeprazole. (AR 1077). She continued to smoke 30 cigarettes a day. (AR 1077). She could flex to touch about halfway above her knees; bending to the right was better than to the left, but it was still limited. (AR 1077). Triple flexion was performed surprisingly well for her limited range of motion. (AR 1077). A sitting straight leg raise test was negative; strength, sensation, and reflexes were intact. (AR 1077). Dr. Keucher noted that Klinger exhibited two positive Waddell signs—superficial tenderness in her back and greatly increased low back pain on axial compression.[5] (AR 1077). He referred her for an FCE, emphasizing that it was important she attend the appointment. (AR 1077). He stated that once he had the results, he would issue a report to worker's compensation and her attorney could obtain a copy of it. (AR 1077).

On April 1, 2014, a physical therapist completed an FCE, which demonstrated Klinger's "safe capabilities." (AR 1079-88). The FCE revealed that Klinger could lift above the shoulder level 2.5 pounds frequently and 5 pounds occasionally; at the desk/chair level 5 pounds frequently and 10 pounds occasionally; and at the chair/floor level, 2.5 pounds frequently and 7.5 pounds occasionally. (AR 1080). She could push 17.5 pounds frequently and 20 pounds occasionally, could pull 5 pounds frequently and 10 pounds occasionally, and could carry with both hands 5 pounds frequently and 7.5 pounds occasionally. (AR 1080). She could squat,

---

[5] "Waddell signs are indications of non-organic causes of back pain; that is, signs that a patient's reported pain has a behavioral origin. A positive response to at least three of eight signs is considered predictive of non-organic, non-musculoskeletal causes of pain." *Bazile v. Apfel*, 113 F. Supp. 2d 181, 186 n.2 (D. Mass. 2000) (citations omitted).

crawl, kneel, balance, and climb stairs occasionally, but never bend or stoop.  (AR 1081).  She

could use her right foot frequently and her left foot occasionally.  (AR 1081).  In an eight-hour

workday, she could sit for one hour at time and eight hours total; stand for 15 minutes at a time

and two hours total; and walk moderate distances for three to four hours total.  (AR 1081).  The

therapist indicated that the FCE results were valid.  (AR 1080, 1088).

Additionally, from September 2012 through September 2014, Klinger had about 20 visits

for pain management care at Indiana Pain Centers.  (AR 1183-1225).  She was prescribed

various medications, including Neurontin, Norco, and Oxycontin.  (AR 1183-1225).  She

ambulated without an assistive device, and her gait was normal, stable, and with equal arm swing

and good stride.  (AR 1186, 1192, 1198, 1204, 1216-17, 1222-23).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The

Court's task is limited to determining whether the ALJ's factual findings are supported by

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

(citation omitted).  The decision will be reversed only if it is not supported by substantial

evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869

(7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative

record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or

substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See*

---

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §

404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a

finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001)

(citation omitted). A negative answer at any point other than step three stops the inquiry and

leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof

lies with the claimant at every step except the fifth, where it shifts to the Commissioner.

*Clifford*, 227 F.3d at 868 (citation omitted).

### B. The Commissioner's Final Decision

On November 12, 2014, the ALJ issued the decision that ultimately became the

Commissioner's final decision. (AR 27-38). At step one, the ALJ concluded that Klinger had

not engaged in substantial gainful activity after her alleged onset date of September 15, 2010,

through her date last insured, June 30, 2012. (AR 29). At step two, the ALJ found that Klinger

had the following severe impairments: degenerative disc disease of the lumbar spine and a

history of a lumbar strain in 2010. (AR 29).

At step three, the ALJ concluded that Klinger did not have an impairment or combination

of impairments severe enough to meet or equal a listing. (AR 30). Before proceeding to step

four, the ALJ determined that Klinger's symptom testimony was "not fully credible" (AR 31) to

the extent that it was inconsistent with the following assigned RFC:

> [T]hrough the date last insured, the claimant has the [RFC] to
> perform sedentary work . . . , with the following additional
> limitations: lift above shoulder level 5 pounds occasionally and 2.5
> pounds frequently; lift desk/chair level 10 pounds occasionally and
> 5 pounds frequently; lift chair/floor level 7.5 pounds occasionally
> and 2.5 pounds frequently; push 20 pounds occasionally and 17.5
> pounds frequently; pull 10 pounds occasionally and 5 pounds

frequently; carry 7.5 pounds occasionally and 5 pounds frequently; stand for approximately 2 hours per 8-hour workday; walk 3 to 4 hours per 8-hour workday; and sit for approximately 8 hours per 8-hour workday, with normal breaks. The claimant requires the option to alternate between sitting and standing, but the positional change will not render her off task more than 10 percent of the work period. She is limited to occasionally climbing ramps and stairs, balancing, stooping, crouching, kneeling and crawling; never climbing ladders, ropes or scaffolds; and must avoid concentrated exposure to excessive vibration and unprotected heights. She is unable to engage in complex or detailed tasks, but can perform simple, routine and repetitive tasks consistent with unskilled work and is able to sustain and attend to task throughout the 8-hour workday. She is limited to low-stress work, defined as having only occasional decision-making required and only occasional changes in the work setting.

(AR 30). The ALJ found at step four that through her date last insured, Klinger could not perform any of her past relevant work. (AR 36). At step five, based on the assigned RFC and the VE's testimony, the ALJ concluded that through her date last insured, Klinger could perform a significant number of unskilled, sedentary jobs in the economy, including addresser, surveillance system monitor, and document preparer. (AR 37). Therefore, Klinger's application for DIB was denied. (AR 38).

### C. The ALJ's Evaluation of Dr. Keucher's Opinion Is Supported by Substantial Evidence

Klinger's sole argument on appeal is that the ALJ failed to properly evaluate the opinion of Dr. Keucher, her treating specialist. Ultimately, Klinger's assertions amount to no more than a plea to this Court to reweigh the evidence, which it cannot do.

The Seventh Circuit Court of Appeals has explained that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870 (citations omitted); *see* 20 C.F.R. §

404.1527(c)(2).  However, this principle is not absolute, as "[a] treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870 (citation omitted); *see Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. § 404.1527(c)(2).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner applies the following factors to determine the proper weight to give the opinion:  (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner.  20 C.F.R. § 404.1527(c); *see Books*, 91 F.3d at 979.  The Commissioner must always give "good reasons" for the weight ultimately applied to the treating source's opinion.  20 C.F.R. § 404.1527(c)(2); *see Clifford*, 227 F.3d at 870.

Although an ALJ may decide to adopt the opinions in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ.  20 C.F.R. § 404.1545(e); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996) ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment.").  The RFC is a determination of the tasks a claimant can do despite her limitations.  20 C.F.R. § 404.1545(a)(1).  The RFC assessment:

> is based upon consideration of all relevant evidence in the case
> record, including medical evidence and relevant nonmedical
> evidence, such as observations of lay witnesses of an individual's

> apparent symptomology, an individual's own statement of what he
> or she is able or unable to do, and many other factors that could
> help the adjudicator determine the most reasonable findings in
> light of all the evidence.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. § 404.1545. Thus, a medical

source opinion concerning a claimant's work ability is not determinative of the RFC assigned by

the ALJ. *See Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he determination of a

claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide."

(citing 20 C.F.R. § 404.1527)); *see* SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996).

Here, the ALJ penned more than three paragraphs concerning Dr. Keucher's treatment

notes. (AR 33-36). Specifically, the ALJ considered that Dr. Keucher released Klinger to return

to work in August 2012, assigning her the following permanent restrictions: "sit/stand as

needed; no bending; no twisting; no lifting greater than five pounds, no overhead work, and no

heights." (AR 34 (citing AR 1027)). Ultimately, the ALJ assigned Dr. Keucher's opinion

"some" weight, explaining her reasoning as follows:

> The undersigned . . . gave some weight to the opinion from Dr.
> Keucher, since he treated the claimant prior to the [date last
> insured] and also saw her in 2014. However, his permanent
> limitations of five pounds lifting and no bending are not fully
> supported by the evidence adduced at the FCE. The claimant's
> presentation also is somewhat suspect, given the presence of two
> Waddell signs at her last examination, indicating questions of
> validity.

(AR 35-36).

While the ALJ afforded "some" weight to Dr. Keucher's opinion, the ALJ gave "greatest

weight" to the findings from the FCE performed by the physical therapist in April 2014. (AR

35). The FCE results differed from Dr. Keucher's restrictions in that the FCE results reflected

that Klinger had slightly greater "safe [lifting] capabilities" than the lifting limitation assigned by

Dr. Keucher. Specifically, the FCE results indicated that Klinger could frequently lift 2.5 pounds with both hands above the shoulder level, 5 pounds at the desk/chair level, and 2.5 pounds at the chair/floor level; and occasionally lift 5 pounds above the shoulder level, 10 pounds at the desk/chair level, and 7.5 pounds at the chair/floor level. (AR 1080). In contrast, Dr. Keucher simply limited Klinger to lifting no more than five pounds. (AR 654, 1027). When assigning "greatest" weight to the FCE results, the ALJ also considered that the FCE findings were consistent with the opinion of Dr. Onamusi, who found that Klinger could perform sedentary to light work. (AR 35).

In pursuing a remand, Klinger does not suggest—and wisely so—that the ALJ should have afforded Dr. Keucher's opinion controlling weight. As explained earlier, a treating physician's opinion is only entitled to controlling weight if it is "well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870 (citation omitted). Klinger concedes that Dr. Keucher's August 2012 opinion is inconsistent in certain respects with the FCE results and the opinions of Dr. Onamusi and the state agency physicians, and therefore, that Dr. Keucher's opinion is not entitled to controlling weight. (DE 17 at 8). Klinger argues, rather, that "the ALJ still must consider the mandatory factors [under 20 C.F.R. § 404.1527(c)] to determine what weight the opinion should be given." (DE 17 at 8). In her rather sparse opening brief, Klinger contends that the ALJ "did not discuss and evaluate" several of the factors with respect to Dr. Keucher—i.e., that Dr. Keucher had examined her, that he had treated her numerous times, and that he is a specialist. (DE 17 at 7-8).

Klinger's opening arguments, however, are unpersuasive, as the ALJ *did* consider the factors that Klinger cites. The ALJ acknowledged that Dr. Keucher initially examined Klinger in

March 2012 and that Dr. Keucher is a neurosurgeon. (AR 33 ("[C]laimant was evaluated for her back complaints by Dr. Thomas Keucher, a neurosurgeon, on March 1, 2012 . . . .")). The ALJ then summarized the findings from Dr. Keucher's initial evaluation on March 1, 2012, as well as his findings from Klinger's appointments from March to August 2012. (AR 34). The ALJ also reviewed Dr. Keucher's findings from Klinger's appointment in March 2014, noting that it was her first appointment with Dr. Keucher in 18 months. (AR 34). This demonstrates that when weighing Dr. Keucher's opinion, the ALJ was well aware of Dr. Keucher's specialty, that Dr. Keucher examined Klinger, and the frequency and number of times that Klinger visited Dr. Keucher.

In her reply brief, Klinger concedes that the ALJ did, in fact, mention several factors listed in 20 C.F.R. § 404.1527(c) with respect to Dr. Keucher's opinion. Klinger then clarifies her arguments, asserting that the ALJ should have assigned *more* weight to Dr. Keucher's opinion based on these factors. As Klinger sees it, the ALJ should have assigned more weight to Dr. Keucher's opinion than the FCE results because Dr. Keucher is a neurosurgeon and because he saw Klinger for 10 visits. Klinger points out that in contrast, the FCE was completed by a physical therapist, who saw her for just one visit. (DE 23 at 2).

Klinger's arguments are unpersuasive. The ALJ gave good reasons for assigning less weight to Dr. Keucher's opinion. *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (stating that an ALJ must give "good reasons" for declining to give a treating physician's opinion controlling weight); *see also Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) ("An ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection." (citations omitted)). The five-pound lifting restriction assigned by Dr. Keucher in 2012 was more conservative than the "safe [lifting] capabilities" demonstrated by Klinger during

the more recent FCE (AR 1079); Dr. Keucher was the physician who referred Klinger for the FCE (AR 34, 1078-79); and the FCE results were more consistent with Dr. Onamusi's opinion, which found that Klinger could perform sedentary to light work. (AR 34-36). Dr. Keucher's opinion also contrasted with the state agency physicians' opinions, who opined that Klinger had the ability to perform light work. Given these circumstances, the ALJ was justified in giving greater weight to the medical evidence contradicting the five-pound lifting restriction assigned by Dr. Keucher. *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) (explaining that after properly concluding that a treating physician's opinion is not entitled to controlling weight, the weight actually applied to the treating physician's opinion depends on the circumstances presented); SSR 06-3p, 2006 WL 2329939, at *5 (Aug. 9, 2006) ("Giving more weight to the opinion from a medical source who is not an 'acceptable medical source' than to the opinion from a treating source does not conflict with the treating source rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2) and SSR 96-2p . . . .").

The ALJ made another comment related to Dr. Keucher's treatment notes that Klinger challenges. At her 2014 examination, Dr. Keucher documented that Klinger exhibited two positive Waddell signs—superficial tenderness in her back and greatly increased low back pain on axial compression. (AR 36 (citing AR 1077)). Noting this documentation, the ALJ stated: "The claimant's presentation also is somewhat suspect, given the presence of two Waddell signs at her last examination, indicating questions of validity." (AR 36). Klinger takes issue with this statement by the ALJ, asserting that the ALJ improperly "played doctor" because Dr. Keucher did not state that the two positive Waddell signs made her presentation suspect. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." (citations omitted)). The Court

agrees that the ALJ went too far in making this statement.  Dr. Keucher did not explicitly state that the two positive Waddell signs made Klinger's presentation suspect, and as such, the ALJ erred in going beyond Dr. Keucher's documentation to reach that conclusion.  *See Nathan v. Astrue*, No. C11-6054-JPD, 2012 WL 12874982, at *10 (W.D. Wash. Sept. 4, 2012) (finding that the ALJ erred by concluding that two positive Waddell signs were evidence that the claimant was malingering where no medical source had opined to that effect); *Hupp v. Barnhart*, No. 1:02-CV-223, 2003 WL 21919183, at *9 (N.D. Ind. Feb. 26, 2003) (same).

Having said that, the ALJ's comment concerning the Waddell signs does not materially undermine the "good reasons," *Larson*, 615 F.3d at 749, provided by the ALJ for affording greatest weight to the FCE results.  *See Nathan*, 2012 WL 12874982, at *10 (finding that although the ALJ erred by interpreting two positive Waddell signs as evidence of malingering where no medical source opined to that effect, this was a harmless error because the ALJ cited other evidence showing that the claimant's symptoms were not as debilitating as she claimed); *Secrest v. Astrue*, No. 1:09-cv-00708-JMS-RLY, 2010 WL 2071360, at *5 (S.D. Ind. May 21, 2010) (same).  To reiterate, the ALJ found Dr. Keucher's five-pound lifting limitation to be inconsistent with the more recent FCE results demonstrating slightly greater "safe [lifting] capabilities" (AR 1077) and inconsistent with Dr. Onamusi's limitation of sedentary to light work.  After considering the factors articulated in 20 C.F.R. § 404.1527(c)—Dr. Keucher's speciality as a neurosurgeon, that he examined Klinger, and that he treated her for several months in 2012 and one time in 2014 (AR 33-36)—the ALJ afforded Dr. Keucher's opinion "some" weight, but chose to assign "greater weight" to the more recent FCE results.[7]  (AR 35).

---

[7] While Dr. Keucher and the FCE results both restricted Klinger from bending or stooping, the ALJ did not incorporate this restriction into the FCE and instead limited Klinger to occasional bending

If the ALJ discounts a treating physician's opinion after considering the factors articulated in 20 C.F.R. § 404.1527(c), "we must allow that decision to stand so long as the ALJ 'minimally articulate[d]' his reasons—a very deferential standard that we have, in fact deemed 'lax.'" *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (alteration in original) (quoting *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008)). Here, the ALJ sufficiently articulated his reasoning for declining to afford Dr. Keucher's restrictions substantial weight to satisfy this "lax" standard. *Id.* Therefore, the ALJ's decision assigning "some" weight to Dr. Keucher's restrictions and "greater" weight to the FCE results will be affirmed. *See Clifford*, 227 F.3d at 869 (The Court cannot "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner's." (citations omitted)).

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Klinger.

SO ORDERED.

Entered this 9th day of August 2017.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

---

and stooping. (AR 35-36). This distinction, however, is ultimately immaterial because the ALJ limited Klinger to sedentary work, and the VE testified at the hearing that a restriction of "no stooping" does not impact sedentary work. (AR 81 ("Generally, the restriction of stooping - - as long as they can still stoop to the degree that's needed to be able to sit, that would not affect sedentary work.")). The FCE results reflect that Klinger had the capability to sit for eight hours in an eight-hour workday. (AR 1081).